Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7754 | **DATE** | 12/17/2004 |
| **CASE TITLE** | Daniel Plump vs. Kraft Foods North America, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____ .
(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .
(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .
(7) ☐ Trial[set for/re-set for] on _____ at _____ .
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Defendant Kraft's motion for summary judgment [45-1] is granted. Case terminated.
(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 2 1 2004 | 51 |
| | Notified counsel by telephone. | | date docketed | |
| X | Docketing to mail notices. | | JXM | |
| X | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| RJ/TC | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice  mailing deputy initials | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| DANIEL PLUMP, | ) | | |
| | ) | | |
| Plaintiff, | ) | Case No. 02 C 7754 | |
| v. | ) | | **DOCKETED** |
| | ) | | |
| KRAFT FOODS NORTH AMERICA, INC., | ) | Judge Joan B. Gottschall | DEC 2 0 2004 |
| | ) | | |
| Defendant. | ) | | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Daniel Plump filed this lawsuit against his former employer, Kraft Foods Global, Inc.[1] ("Kraft"), alleging that his employment was terminated because of his race and gender in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. § 1981 ("Section 1981"). For the reasons that follow, Kraft's motion for summary judgment is granted.

## BACKGROUND

In 2002, Plump, an African-American man who had a twenty-two year career at Kraft, held the managerial position of Regional Customer Service Manager II in Northlake, Illinois. Plump managed customer service for one of Kraft's major customers, the Kroger account, within Kraft's Central Area Customer Service region. During the Spring of 2002, Plump's Kroger team won a performance incentive, the prize for which was $100 per employee to be spent in whatever way the team selected. Plump's twenty-four person team elected to spend the money at Gibson's, a Chicago restaurant located approximately 18 miles from Northlake. As manager of the team and the highest

---

[1] During the pendency of this case, Kraft Foods North America, Inc. changed its name to "Kraft Foods Global, Inc."

ranking Kraft employee at the event, Plump was responsible for overseeing and paying for the dinner, which was considered a company event. On Friday, May 10, 2002, Plump drove his car to the dinner at Gibson's and parked it with a valet attendant down the street from the restaurant.

Plump and the other Kraft employees consumed alcohol while at Gibson's, where 40% of the total bill was spent on 20 bottles of wine and 65 individual alcoholic drinks. Of the twenty-four attendees, at least one employee was not drinking alcohol as she was pregnant at the time. After the dinner concluded at Gibson's, Plump and some other Kraft employees left Gibson's and went out to bars for an "after celebration." The first bar the group went to was the Hunt Club, which is within walking distance of Gibson's. While at the Hunt Club, Plump and other Kraft employees continued to drink alcohol and also danced on the second-floor dance floor. Plump did not pay attention to what the other group members were drinking or whether any of them were intoxicated. At some point, Plump and the group left the Hunt Club[2] and went to a second bar (which Plump could not identify). At the second bar, Plump remembered that he had a coffee, but could not remember if it contained alcohol or not. Plump admitted that he was "not sober" when he left the second bar.

After leaving the second bar, Plump and two members of his team – Michele Norris and Mindy Klitzman – walked back to Gibson's to retrieve his car so that Plump could drive Norris and Klitzman back to their cars in Northlake. At Gibson's, however, the valet attendant refused to bring Plump his car, saying that in his judgment, Plump had had too much to drink. Plump informed the attendant that he did not intend on leaving his car in Chicago and that Norris could drive his car instead. The attendant disagreed and Plump, "being less than happy," continued to press him to

---

[2]According to Kraft, a bouncer from the Hunt Club asked the group to leave. Plump, however, asserts that he has no knowledge that any Hunt Club employee asked any member of the Kraft group to leave the bar.

2

release the car. At this time, a police officer intervened and agreed only to allow Klitzman to drive the car. After Klitzman had driven the car approximately one block, Plump asked her to pull over because he was not comfortable with her driving the car. While he asserted that he intended that Norris (who had also been drinking) would drive the rest of the way back to Northlake, Plump admitted that he may have told Norris and Klitzman that *he* was going to drive the rest of the way to Northlake. At that point, however, the same police officer came up and told the group that they needed to find other means to get home. Plump, Norris and Klitzman then took a taxi back to Northlake. Klitzman maintained that during that taxi ride Plump inappropriately touched her on her buttocks and breasts.

On the Monday following the Gibson's dinner, Klitzman's sister brought Klitzman's sexual harassment claim to the attention of Kwame Salter, Kraft's Vice-President of Human Resources for Sales and Customer Service. Salter directed Chad Simmons, Associate Director of Human Resources, to investigate the sexual harassment allegation. After meeting and interviewing Plump, Klitzman and various other individuals, and reviewing documentary evidence (including emails between Klitzman and her sister and transcripts of voicemails between Klitzman and an unnamed "Recipient"[3]), Simmons informed Salter that, based on his investigation, he believed that Plump had sexually harassed Klitzman and had used inappropriate judgment throughout the evening of May 10 and early morning of May 11, 2002.

Ultimately, Salter found Klitzman's sexual harassment complaint to be uncorroborated and

---

[3] Following the Gibson's dinner, Klitzman communicated with an unidentified male Kraft employee (with whom she was romantically involved) regarding the events of May 10-11, 2002. Magistrate Judge Brown ordered that the identity of this man be protected and that he be referred to as the "Recipient."

3

inconclusive. However, Salter terminated Plump for exercising "poor judgment" on May 10th and 11th by, among other things, permitting a large quantity of alcohol to be consumed at a company-sponsored dinner; failing to make arrangements to ensure the safety of his subordinates following their consumption of excessive alcohol; being the senior Kraft employee at an "after celebration" at a bar where the group was asked to leave; encouraging, through his presence, the continued consumption of alcohol at a second bar; becoming "over-served" during the evening while out with Kraft employees; being so "over-served" that the valet attendant refused to give him his car; giving his keys to a subordinate, Klitzman, who was also intoxicated, and using his position of authority to have her drive his car even though she did not want to drive the car (which Salter believed was coercive); asking Klitzman to pull over so that he could drive despite being "over-served"; and leaving Klitzman a message to come and speak with him on Monday, May 13, 2002 (given that he had never done so before).

## ANALYSIS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party opposing summary judgment may not rest upon the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Racial Discrimination Under Title VII**

Under Title VII, a plaintiff may prove his employment discrimination case either by direct or indirect evidence. Direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus," *Venturelli v. ARC Community Servs., Inc.*, 350 F.3d 592, 599 (7th Cir. 2003), and is "rarely found." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). Despite his assertion otherwise, Plump does not offer any direct evidence. Plump argues that the fact that Salter told him that his "poor judgment" was "getting in a cab with Mindy Klitzman" and "wanting to drive home with Ms. Klitzman in the same car" is direct evidence of his racial and gender discrimination claim. As a preliminary matter, the court may not even consider these facts as Plump failed to provide them in his Local Rule 56.1(b)(3)(B) Statement of Additional Facts. However, even if the court could properly consider them, they are not "smoking gun remarks" indicating that Kraft fired Plump because of his race (or gender). *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (noting that direct evidence of discrimination takes the form of "I fired you because of your age or disability").

When a plaintiff lacks direct evidence, he may utilize the burden-shifting method of proof established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* framework requires the plaintiff to establish a *prima facie* case of discrimination by demonstrating that he: (1) belongs to a protected class, (2) performed his job to his employer's legitimate expectations, (3) suffered an adverse employment action despite performing satisfactorily, and (4) received less favorable treatment than similarly-situated employees outside the protected class. *Hildebrandt v. Ill. Dep't of Nat'l Res.*, 347 F.3d 1014, 1030 (7th Cir. 2003). If the plaintiff succeeds, the burden shifts to the defendant to provide legitimate, non-discriminatory reasons for its conduct;

and if the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's reasons were pretextual. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004).

Because the court finds that Plump's failure to satisfy the fourth *McDonnell Douglas* factor – that other similarly-situated individuals were treated more favorably – is fatal to Plump's claim, the court need not address the other factors. In order to survive summary judgment, Plump must show that he has been treated more harshly than another employee who is not in the protected class and is similarly situated "with respect to performance, qualifications, and conduct." *Radue*, 219 F.3d at 618. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617-18.

Here, Plump does not put forward any coherent argument with respect to any other similarly-situated employees who were treated more favorably than he. Perhaps in an attempt to meet the fourth *McDonnell Douglas* factor, Plump argues that Klitzman and the "Recipient" somehow received better treatment than he did. Specifically, Plump alleges that Kraft investigated his alleged misconduct yet failed to investigate an alleged "illicit love affair" between Klitzman and the Recipient. Putting aside the fact that these allegations of an "illicit love affair" are unsupported by any evidence, this argument does nothing to show that someone similarly situated to Plump (but female and/or non-African-American) was treated more favorably. Engaging in an "illicit love affair" is not conduct similar to that of Plump's during and after the Gibson's dinner. Further, even if the court were to assume that Plump intended to point to Klitzman as a potential comparator, there is nothing in the record that supports the notion that Klitzman was comparable to Plump. It is

6

undisputed that Plump was Klitzman's supervisor and was the highest ranking Kraft employee at the Gibson's dinner and "after celebration." Plump, who was a Salary Grade 14 employee and made approximately $121,560 a year (plus stock options), is not similarly situated to Klitzman, who is not a supervisor, is a Salary Grade 5 employee and made approximately $41,685 a year. Because there is no evidence in the record of any other employee who engaged in a series of behaviors that, cumulatively, amounted to poor judgment on the part of a Kraft supervisor and was treated more favorably than Plump, Plump has failed to satisfy *McDonnell Douglas*'s fourth factor.

Finally, even if Plump could meet the four factors of *McDonnell Douglas*, he cannot show that Kraft's reason for firing him – his "poor judgment"– was pretext for a discriminatory motive. To demonstrate pretext, Plump must provide sufficient evidence that Kraft was "motivated by a discriminatory reason" or that Kraft's proffered explanation "is unworthy of credence." *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 676 (7th Cir. 2003). Kraft maintains that it terminated Plump for his "poor judgment" as evidenced by a series of events occuring throughout the evening of May 11 and morning of May 12, 2002. Plump attempts to argue that the "poor judgment" reason was pretextual because he disputes Kraft's assertion that: (1) the Gibson's bill exceeded the allotted amount; (2) he was not asked to leave the bar by a bouncer; (3) the valet (and not Plump) gave the car keys to Klitzman; and (4) Plump's May 13, 2002 message to Klitzman was sent by email, not handwritten note. As an initial matter, whether or not the Gibson's bill was or was not over the allotted amount is immaterial as that fact was not relied upon by Kraft in its decision to terminate Plump. With respect to whether or not Plump was asked to leave the second bar, Kraft was informed by two other individuals at the bar that Plump and/or the group had been asked to leave. The issue here is whether or not Kraft "honestly believe[d] the reasons it offer[ed]," not whether or not the

7

decision to terminate was correct or desirable. *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 323 (7th Cir. 2001). Plump offers no reason that Kraft should have concluded that the two individuals were lying or mistaken. Finally, Plump's assertion that the mode of communication between himself and Klitzman was different from that asserted by Kraft (while not denying that the request was made) is immaterial.

Here, Kraft has presented undisputed evidence that it thoroughly investigated the incidents surrounding the Gibson's dinner by interviewing numerous employees, including Plump, Klitzman and Norris, and reviewing emails and telephone transcripts. Based on the information gained through this investigation, Kraft determined that Plump exercised "poor judgment" and terminated him because of it. Plump has not pointed to any specific facts that cast Kraft's explanation "in doubt," *id.*, or that Kraft did not "honestly believe the reasons it gave for terminating him." *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 718 (7th Cir. 1999). Therefore, Plump cannot avoid summary judgment on his Title VII racial discrimination claim for the additional reason that he failed to put forward any evidence that Kraft's reason for firing him was pretextual.

**Gender Discrimination Under Title VII**

Under *McDonnell Douglas*,[4] a plaintiff may establish a *prima facie* case of gender discrimination by showing that he: (1) belongs to a protected class; (2) performed his job satisfactorily; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated employees outside of his class. *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir. 1994). The fact that Plump is a man does not doom his gender discrimination claim because the

---

[4] As explained above with respect to Plump's racial discrimination claim, Plump does not put forward any direct evidence of gender discrimination.

protections of Title VII "are not limited to members of historically discriminated-against groups." *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999). The Seventh Circuit has held that, instead of showing the first element of *McDonnell Douglas,* a reverse discrimination plaintiff must demonstrate, as part of his *prima facie* case, that there are "background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites [or men] or evidence that there is something 'fishy' about the facts at hand." *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003) (internal citations omitted). As outlined above, Plump has failed to put forward any evidence of a similarly-situated woman who was treated more favorably than he was. Further, Plump does not even address the additional evidence required of a male plaintiff bringing a gender discrimination claim. In light of both these deficiencies, Plump's gender discrimination claim is dismissed.

**Section 1981 Claim**

Section 1981 gives all persons within the jurisdiction of the United States the same right to make and enforce contracts as is enjoyed by white citizens. 42 U.S.C. §1981; *Partee v. Metropolitan Sch. Dist. of Washington Township*, 954 F.2d 454, 456 (7th Cir. 1992). Because the analysis under Section 1981 mirrors that of Title VII, *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999), Plump's Section 1981 racial discrimination claim also fails for the reasons explained above.

## CONCLUSION

Kraft's motion for summary judgment is granted.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: December 17, 2004